This is our second case today. Case number 04131043. Mark Wilson et al. v. Robert Schaefer et al. Attorney Wilder is here on behalf of the appellant. Attorney Unrath and Stewart. Attorney Unrath and Stewart on behalf of the athletes. Are you splitting your time, Mr. Unrath? Yes, we are. Okay, and you've told the clerk? Yes. All right, great. All right, Mr. Wilder, you ready to proceed? Good morning. I'm Jim Wilder. I represent Mark and Sandy Wilson. We're asking that you reverse or vacate the summary judgment the trial court entered, remain in this case for further proceedings and trial. The only counts that remain in this case were informed consent counts. Of the four elements on informed consent, the summary judgment is granted on the element of proximate cause. The element of whether there was a duty to disclose. There was no dispute on that. Plaintiff's expert, Dr. Smith, said that the complication that Mark Wilson sustained, which was sciatic nerve injury or foot drop, which has also resulted in burning and tingling, that had to be disclosed. And Dr. Schaefer agreed that it was his duty to disclose. And he said he would have told patients of sciatic nerve, I think he said palsy, sciatic nerve palsy and foot drop. And our expert said you specifically tell of that complication. Dr. Smith said it's a three to four percent frequency rate, so it's not a one in a million deal. So that's the first element. The fact that Mark had the foot drop from the surgery, again, is not in dispute. He had it in the hospital immediately afterwards. He's had it ever since. There was a dispute as to whether he was told, but the trial court, Judge Ford, said that that created an issue of fact. Mark said he was not told of the risk of foot drop or nerve injury. Dr. Schaefer said he could not recall his conversation with Mark. His routine would have been to tell, because, again, it was his view, it was his duty to tell of that complication. His routine would have been to tell, but that created an issue of fact, which Judge Ford... There would have also been a physician's assistant involved in that, wasn't there? There was a physician's assistant. He also said, I ordinarily would, but... I believe the PA, Freeman, said, I wouldn't discuss specific risk. I would go through the consent forms, but I would leave it to the surgeon. Mark saw Dr. Schaefer, July 22nd of 2004, the prep for the August 18 surgery with PA Freeman. We took his deposition. He says, I don't discuss specific risk. I leave that to Dr. Schaefer, the surgeon. I go through the consent forms. The consent form says, I've had the risk told to me by the surgeon, but it doesn't say what risk. Why don't they put the risk in the consent form? Make it too long? I don't know how it would be too long. I've wondered for years why you don't. Instead, it's as vague. Being a plaintiff's lawyer, I could be a little biased in that regard, saying that consent forms are for litigation, for liability purposes. Yeah, if they listed them and the patient signs off, there's no issue. That would sort of end everything, wouldn't it? Nobody would get surgery. Have we had this case up here before? You have. I thought we did. What was the issue then? Briefly, this case was filed. It was voluntarily dismissed, filed in 06, voluntarily dismissed, refiled in 08. And we added counts, not just of informed consent, which we had initially, but specific negligence against Dr. Schaefer. And I should say, Chrissy's only in this on agency, so there's two defendants. We added specific counts of negligence against Dr. Schaefer under the Relation Back Doctrine. Judge Ford denied that. It came up here. We argued it. We had a decision, three to nothing, in our favor, I believe written by Justice Connect. A petition for a re-hearing was filed. It appended for 22 months, and the re-hearing was denied. The decision was modified in a two-to-one decision in favor of the defense of Justice Connect. So we went back, and now it's just informed consent, and that's what summary judgment is now. But are those negligence claims still out there? No, because he had dismissed them, saying they didn't relate back. We came up here, and this court said, yes, they do, and then modified and said, no, they don't, in a two-to-one decision. Oh, okay. So then we ended up back there on just the informed consent counts. So there was a genuine question of fact as to whether he was told or not told, and Judge Ford recognized that. Then we get to proximate causation, and there's two issues, I guess, on that. The first one was the test the court used. The plaintiff said you should use the Coriell test, which is, was there a duty to disclose, undisputed in this case, and does the plaintiff say that if it had been disclosed, the plaintiff would not have had the surgery? Again, Mark Wilson was adamant on that fact. The defense said the court should use a St. Jim, however you say that case, from 1983, that says that you have to have just objective testimony. St. Jim came out in 83 and said you need objective testimony or expert testimony, and it's the plaintiff saying they wouldn't have had it doesn't matter. In fact, in this case, Judge Ford said at one point in his, he had a lengthy oral decision. He said that the fact that Mark Wilson says he wouldn't have had it creates an issue of fact, but it's not a material issue of fact, since that's just his subjective statement that he wouldn't have had it. St. Jim phrased it like, what would a reasonable person in these circumstances do based on objective evidence? I guess, although I don't know the distinction between objective and subjective. The trial court said, well, it's objective that Mark Wilson says he has pain. It's objective that he has difficulty, has pain when he walks. But then did it discuss the fact that if that's objective, then it would have, but it's subjective when he says he wouldn't have had surgery, but if it's objective that he says he has pain, it's objective when he says he has difficulty in doing things, and it should have been referenced, I think, that it was also objective that he could do everything. Some of it took a little longer. He was going to Gold's gym three days a week to work out. The pain was a 5 on a scale of 10, and he had nights where, some nights where he had pain, but other nights when he had no pain. But instead, the trial court, on the objective decision that no reasonable person would not have had, would have, would, no reasonable person would have refused the surgery, said that I don't understand objective versus subjective when you get into what somebody says. Well, in that St. Jimmy case, what Harvey said, there were no alternatives. Exactly. But in this case, it seems like there were conservative treatments that he could continue to use. There were multiple alternatives. And that's what we said at the trial level, St. Jimmy, and St. Jimmy's never been basically cited since Coryell, and Coryell's been followed by the 1st District and Schiff, the 3rd District and Marvin, Northern District of Illinois and Fort Chalibo, and St. Jim hasn't been followed. Well, in St. Jim, it was, the court said, noted that all of the experts agreed there was no reasonable alternative. The lady had an infected molar that was going to abscess. It had to be taken out. There wasn't any therapy or antibiotics that was beyond that point. It was life-threatening. Would you agree that the reasonable alternative here is simply delay? That's one of them. The defendant, Schaffer, said conservative treatment was a viable option. He said it was a good option if that's what was selected, and some people never have it. He also said in his deposition that further physical therapy was an alternative. Mark had had some, and he'd gotten minimal relief. Further injections, steroid injections, were an alternative. He had two. The first one provided relief for a substantial period. The second one didn't provide much relief. And third, conservative treatment, and just wait until it got. Mark was 53, and I've already went through some of the stuff he could do. He had pain, but, in fact, he'd seen a fellow, not fellow, a doctor named Percio the year before who said you're too young to have this surgery at this point when he was 52. And that's when he went into the physical therapy, when he went into. But Dr. Schaffer says all of those were options for Mark. And Dr. Schaffer testifies that he has patients who decide to delay until the pain progresses to where it's unbearable and they can't do anything. The defendant, Schaffer, in the brief says that, well, actually, despite what Dr. Schaffer testified in the deposition, says actually the only option was surgery because the alternative would have been he would have been bedridden and unable to walk. And we pointed out in the reply brief the page they cite to of Dr. Schaffer's testimony is where I ask him, well, if he went to conservative treatment, what could that mean? And he said it could mean a retirement or sedentary lifestyle. He agreed with that. I'm getting older, but retirement or sedentary lifestyle doesn't equate to bedridden and unable to walk. There's no testimony that was the only other option. So he had the option of whether going forward or not going forward, and that's how this case is different than St. Jim. And why it's like Coryell where the lady had an abdominoplasty and wasn't told about some of the risks associated with the wound and said if I'd known all that, I wouldn't have elected to have the surgery. So this is an elective surgery. And if you have no alternative like St. Jim, then the testimony that, well, I wouldn't have had it, I would have died instead or something like that, is understandable why, well, that can't be a much moment. But most surgeries don't fall in that category. Most people make elections. And the testimony, again, from Schaefer, from the plaintiff's expert in this case, is that some people decide to have it, some people don't decide to have it. We pointed out Schaefer says the people who don't have it are not unreasonable, the ones who delay. Dr. Smith said it's an option that a reasonable person could select, but he goes right on in the next question, which isn't cited in the briefs, and said I have some people who delay and decide not to have it then. Schaefer says he has some people who never have it. It depends on how bad it progresses. And that's why the failure to inform in this instance falls more with Coriell, and I suggest Coriell is what has been followed basically ever since it came out, which is informed consent, approximate causation, is different than the typical medical negligence cases Coriell describes. In the usual, or I shouldn't say typical, but in a lot of medical negligence cases, it's fair to take the test, you know, remove this, allow the disease to progress, and as a result surgery wasn't an option. You may need medical evidence or expert testimony on that point because the layperson doesn't know the significance of fair to take the test. But when it's a failure to tell, it means the person did not proceed, a reasonable person or prudent person would have proceeded. As Coriell says, nobody's in a better position to determine that than the jurors. You don't need an expert. In fact, I would suggest the doctors aren't the ones who are qualified to say how a reasonable patient would work. It's the 12 members of the community who say, under all the circumstances where they hear the testimony, no, it would be a reasonable person would have had it, or no, a reasonable person wouldn't have had it, when they hear the plaintiff's reasons for not having it, when they view the plaintiff, you know, the credibility, and so on. So I think that's why in an informed consent case, the idea that can only be objective evidence, whatever that means, and it has to be expert testimony in an informed consent case doesn't make sense. The defense says if you follow Coriell, there'll never be summary judgments created in informed consent cases, or the sky will fall. Well, the first district's following it, the third district's following it, the federal courts are following it. I don't know about the second and fifth. They haven't published anything. And this court hasn't published anything in 31 years on it. And so I don't think the sky will fall if it's not falling elsewhere. It will be jury questions because, again, summary judgments are drastic remedy. Second thing is the defense says, well, actually Mark was told. And the issue on that one, testimony is as I related before, but Mark, when he was being deposed, said that in connection with the anesthesia, somebody said they could hit my spine, and if they hit my spine, something could happen. And then under further questioning, they said, well, did you understand, it could be paralysis if they hit your spine when they gave you the anesthesia? He said, yeah, it could be paralysis. So you knew there was a risk of paralysis before you went into surgery? Yes. The defense argued, and the trial court said this is an admission that he knew of the risk of the injury. Being told by someone, and nobody, Schaefer says he didn't tell him, Freeman didn't discuss risk, Mark says he doesn't remember, he was asked, was it July 22nd or August 11th? July 22nd was Schaefer, August 11th was Freeman. He said, I don't remember. He was asked again. He said, I don't remember. He was asked, would it have been one of those two, correct? He goes, yes. He was never asked about was it the morning in the hospital when he would have been seen by the anesthesiologist, but that's what Schaefer presumes would have occurred. But being told that if you have a needle put into your spine, there's a risk of paralysis from anesthesia, does not mean you've been informed there's a 4% chance from having your hip dislocated, having retractors around your hip and so on, that you're going to come out with permanent foot drop. We've argued that it's the physician's duty to tell his patient. The physician stands in a special relationship. The defense says it doesn't matter who tells him. If some anesthetist mentioned, you know, hitting your spine could cause paralysis, that equates somehow to letting Schaefer off the hook for failing to tell about the complication, specific complication, which he says he would routinely mention and should have mentioned, and if he didn't, he breached the standard. And I suggest if Mark was told something, he says he was, by something about the anesthesia, that doesn't mean that he was told anything about the risk of foot drop because somebody was going to use a needle and give him regional anesthesia. The next position by the defense is... Wouldn't it be true, though, that paralysis, in the ordinary meaning of the word, the patient would think, damn, I won't be able to walk. That would be true, but the question is would a patient, what did they tell him, whoever told him that if he hit your spine there's a risk of anesthesia, what did the patient know about that? And in terms of... If, in fact, an anesthetist said, you know, we could cause paralysis by using the needle on your spine, if that somehow obviates the duty of a surgeon to tell about the risk of surgery, you know, unrelated to the anesthesia, the surgery itself, then, I mean, they say there's a chance of death when you have regional, you know, it's rare, but people could, that's a risk. You could die from getting anesthesia. Okay, so you get the anesthesia, you undergo the surgery, and you bleed to death, and the surgeon failed to tell you there was a 30% chance with the surgery you'd bleed to death, and they say, well, you accepted that even though you weren't told because some anesthetists said with anesthesia there's always going to be a reaction and you could die. Is it fair game, though, at trial? Oh, yeah, they could... For them to ask questions about that and argue to the jury, he knew that as far as the anesthesia went, so isn't it reasonable to think he would have been sentenced? That's argument, exactly, and I'm not, this isn't a motion to eliminate, I just want to get to trial and let the jury see Mark Wilson. I mean, Judge Ford started off his discussion, and it's, I wasn't there for the argument, one of my partners did it, I think it was in trial, another trial, but he started off his, like, 40-page, his oral discussion is longer than everybody's argument. He starts off by talking about how Mark, said he didn't know there was a risk of a lot of blood loss associated with it, and he says, but there's a consent form that says there may need to be a transfusion, and he didn't know about HIV, and there's a consent form, and so on, and then goes on for pages on that, and says, I just point this out to show that Mr. Wilson, you know, is inconsistent in some of those things, but instead of weighing the credibility of the witness, which you don't do at summary judgment, they can point that out at trial, and I assume that's why they asked the question. So yeah, they can point it out at trial that you knew you could be paralyzed, and I can get a chance to argue and say, each and every one of you, on every procedure, you know, the anesthetist tells you there's these risks, and you either follow up and find out how likely they are, or, based on experience, know that very few people die or come out of, you know, paralyzed from having spinal anesthesia, and decide to go forward. That may be the case. That doesn't mean you'll accept, I mean, if you go in a hospital, there's a risk of a nosocomial infection. They have that on all admission consents. That doesn't mean that you shouldn't be told by the surgeon that there's a 20% chance of infection associated with a particular surgery they're going to perform on you, that you've somehow accepted that because you allowed yourself to get admitted to St. John's. Counsel, is there any evidence in the record, other than your client's own statement, that he would not have had the surgery had he been informed of the possibility of a foot drop? There is evidence in the record from Dr. Schaffer that some of the people, when he tells them of all the options, choose not to go forward, and it's not unreasonable, he thinks, for those people. Is that evidence so that your client would not have had the surgery had he been informed, just because the doctor testified that others choose not to have it? That's evidence, I think, of how a reasonable person could act in an admission. Now, as to Mark himself, Mark said, I could do everything, it took a little longer, I slept without pain some nights, some nights I had pain, that it hurt when I walked, whenever I walked I went up the stairs, but I could still do it, it was a 5 out of 10. To be honest, Justice Turner, I'm not sure beyond, since he wasn't... I see what you're saying, what other evidence could there be? The evidence could be if he was in the St. Jimmy's situation, where there was no alternative, and he was almost comatose or whatever, you've got to take it out, but I mean, he had problems, don't get me wrong, but he was also still able to function, and the problems he has now, and he says, if I'd known I could... Well, is it your position then, because I think you're right, it is hard to develop any other evidence, is your position would be that the law, according to Cory L., and I think according to the way you interpret that case, is that if plaintiff in any given case says, I would not have had that surgery had I been properly informed, that's enough to survive summary judgment. It is, if there's expert testimony, there was a duty to inform... Would you agree then that if we adopted that position, we would in essence be disavowing St. Jimmy, whatever the case name is? To some extent, yes, and to some extent you could distinguish it, because again, in St. Jimmy there was no alternative, it was life-threatening. But you would have to disavow it to some extent. I was going to say, it would be duty to inform and viable alternatives. Both of those would have to be present. I don't know if this is what Justice Turner is asking, I'm not very clear on that. In terms of him being deposed, and you've talked about the problems, if somebody just says, I wouldn't have done it, but they don't offer what you're saying your client... My client says, I could still walk, I could still lift, I could still do a lot of things, I could work out. Now, I don't know if he said, my leg flops around. I can't ride a bicycle, I can't do the treadmill because I'll fall off. Right. If Mark Wilson was in bed, bedridden, and unable to walk in a wheelchair because of the pain, and said, I wouldn't have had the surgery, and paralyzed, then you'd say, no reasonable person. But here, everybody agrees, he wasn't at that end of the spectrum. The only problem I might have with that is that St. Jimmy cites the California Supreme Court, I think it was the Cobbs case, and it seems pretty clear what they're saying is, plaintiff self-serving testimony or assertion alone is not enough. You must have some other objective evidence. And I agree with you, this difference between objecting and subjecting is kind of subjective from time to time. And I will say, and I know my time's up, the Cobbs case is discussed by Cory Ellum. They say, we realize Cobbs did that, but they then cite additional California cases afterwards, saying, you know, really, if you hold a plaintiff to that standard, how is plaintiff hardly ever going to prove in a foreign consent case? Because it doesn't always come down when I tell you, here are the risks, unless it's St. Jimmy, where there's no alternative. I mean, you go in and have a heart bypass, you go in and have an angiogram, they tell you you're 98 percent blocked and two arteries, you know, there's no alternative. But that wasn't where Mark Wilson was. Thank you. Thank you, counsel. Mr. Unrath? Thank you. My name is Craig Unrath. I represent Dr. Schaefer. At the outset, I think it's important to point out that plaintiff's expert testified that he was incapable of identifying the specific mechanism that caused Mr. Wilson's nerve injury.  that he had caused Mr. Wilson's nerve injury. that his nerve injury was caused by the epidural anesthesia. But he found that very unlikely, way down low on the list of possibilities. But he said any chance to, if asked to say more likely than not that this was caused by Dr. Schaefer's surgery or the epidural injection, he stated that would be based on speculation. And that's right in the record. Now, Wilson admitted that the anesthesiologist informed him of a risk of paralysis. So he knew prior to surgery that this was a known risk and he decided to go through with the surgery anyway. And as it turns out, the injury he suffered may very well have been caused by the anesthesiologist's conduct. So right off the bat, we have a plaintiff here who is claiming that Dr. Schaefer should be held liable for failing to inform him of a known risk or a known complication of this surgery when in fact he already had knowledge of that risk. He knew that paralysis was a possibility. Did he get that information on the morning during the prep for the surgery? I believe he did from the anesthesiologist but the record is unclear on that. And even plaintiff himself couldn't really say when he obtained that information. Anecdotally, I just went under emergency appendectomy surgery last week. I first learned of it on the day of surgery. Of course, I guess that would be normal. But I don't think that that matters at all. Do you think it matters the context in which he's told and who tells him and what it relates to? Absolutely not. First off, the consent forms, all of them, state that you can revoke this consent at any time. Well, what if all 12 members of the jury say to themselves, I'm thinking about the surgery. I know that crap about anesthesia. Everybody, you know, yeah. But they're going to tell you that and you don't pay any attention to it because they're telling you that when you've already been given a sedative from the night before. But what I'm concerned about is the thing that I'm getting operated on for. That's what I'm focusing on. Would that be reasonable for a person to do? I think that it would be reasonable that any person hearing that an epidural injection has a specific risk of paralysis is essential to this case. Can you remember? Oh, I'm not supposed to do this, am I? Put the juror in the place of the... You're on the jury. Do you remember specifically getting that risk explained by the anesthesiologist? I didn't have an epidural, but I do specifically remember him running down a list of awful things that were going to happen, starting with death. To which you ignored it because you already knew you were going to get the surgery. Oh, absolutely. And I accepted that risk. Did you accept it or ignore it? Oh, I accepted it. I didn't ignore it. I don't see how anybody can ignore it, particularly when the other consent form referred to AIDS. Hepatitis C. But that was the other consent form. Trust me, it caught my attention and I... And you said, yeah, but I've got to get this appendage out. Absolutely. Now, the distinguishing factor in my case was that this was essential surgery. But at the outset, I think that we have to distinguish that there are different types of... Suddenly I've lost the word. Not essential surgery, but elective surgery. We can have elective surgery to erase these wrinkles on my forehead and that's an entirely different thing than elective surgery to have a hip replacement. Keep in mind the objective evidence that came into play here. Mr. Wilson had in mind a surgeon he wanted to perform this surgery, but he was booked solid. He didn't want to wait. He needed that surgery now. Medical records show that he was struggling with the pain. He bypassed the surgeon of his choice and took the very first surgeon he could get because he wanted it now. But that sounds like an argument for the jury. I mean, it's pretty convincing. I agree. I agree. But the fact remains, we don't even need to get to this point. And the trial court's oral ruling, which goes on at length, listing all the objective evidence, I think that that's very persuasive. But I think that the fact that he knew not of just some general issue of death, but he knew specifically from the anesthesiologist that he had a risk of paralysis, that that risk manifested itself in this case, and it may very well have been caused by the anesthesiologist. Now, at this point, it comes down to this. In the context of a proximate cause analysis, there is only one critical question. Did the patient know of the risk and agree to go ahead with the surgery? And in this case, the patient did. His expert admitted that the patient did. The patient himself admitted that he knew that this was a risk and that risk manifested itself. Plaintiff is incapable of establishing the element of proximate cause because he admits he was informed in advance of surgery that the injury he ultimately suffered was a known complication. Opposing counsel suggested, well, this gives everybody a free ride. You know, an anesthesiologist, you sign a consent form with him, you're just opening the door to everything. That's really not the case. There are thousands of different complications. Some of them are very standard. Some of them are very specific. Nobody advised me of paralysis when I was having my appendectomy. Counsel, you seem to be arguing that a layperson would, if advised about paralysis, would equate that to foot drop. I mean, really? It's undisputed that foot drop is partial paralysis. That's exactly what it is. And any person advised that there could be paralysis with regard to receiving anesthesia, equates that to meaning, and by the way, you could get foot drop, too, because foot drop is paralysis? The lack of use of one of my limbs? Yeah, I would call that paralysis. And that's precisely what he has here. Foot drop is a partial paralysis. And all the experts agree. I'm not saying it isn't. I'm not saying the experts don't agree. But this is a layperson. To me, a layperson being told that you have a risk, a specific risk of paralysis, would mean to a layperson that you are going to lose the capability of moving one or more of your limbs. That's what it would mean to me. I think anyone on the street would agree with that. It's not a highly technical term. I think that it's the loss of use of any of your appendages, you might say. The counsel, Mr. Wilder, says that St. Jimmy, basically, I'm kind of paraphrasing, is an outlier. And that it hasn't been followed since it was handed down, what did he say, 31 years ago. Is that correct? No, as a matter of fact, I believe that it's implicitly followed by Coryell. This is an important thing that has to be laid out here. There is a conflict between St. Jim and Coryell. And that conflict is whether you need expert evidence to prove your case. And St. Jim says you do, Coryell says you don't. Now, that conflict has no relevance to the case. Maybe it's somewhere in between. It depends on the facts. Maybe so, but I think that in surgeries of this type, hip replacement, knee replacement, many forms of back surgery, discectomies and things like this, any reasonable juror is going to know that all the experts are going to say the same thing. And what they're going to say is this. They're going to say, in the beginning, your fear of surgery is going to outweigh your pain. But in a degenerative situation that you'll find in a knee and a hip or a lower back, it's going to get worse and worse and worse. And at some point, the pain will outweigh your fear and you're going to have that operation. And that's what the experts said, both of them, said in this case. Yes, there could be some people that will just never do it. They're just never going to have surgery because they're that afraid. That would be pretty rare in a case like this. But they also absolutely agreed that the condition would continue to degenerate, the pain would increase, it would only get worse, it would never get better, and that ultimately he would have a sedentary lifestyle. Now, he says, well, sedentary lifestyle, maybe that's not so bad. Maybe that's just like retirement. No, sedentary means you can't walk. Sedentary means you're in a wheelchair. Sedentary means that you're already experiencing pain when you sit, when you stand, when you climb stairs, when you get into a car, when you do anything. Only that pain's going to keep getting worse and worse and worse. And Dr. Schaefer even pointed that out. He says at a certain point, and his words were, I believe, your hip blows out. Now, I never bothered to explain that, but I think it's a pretty descriptive word is what that happens there. At that point, sooner or later that surgery was going to happen, and in this case, Wilson definitely wanted it sooner. That's why he bypassed his surgeon of choice and went with this doctor. But again... If you could flip that argument and say, had he been properly advised, he said, oh, okay, well, I'm going to wait for that doctor that I really prefer. He was advised that paralysis was a complication. And fully advised. He went into this with his eyes wide open. He knew that he might lose the loss of one of his limbs, one or more of his limbs. And that's what happened. And there is no way that anyone can ever say that this was Dr. Schaefer's fault or the anesthesiologist. There is no way you can say to a degree of medical certainty one way or the other. This may have very well been the result of an epidural. We'll never know. And if you send this back to the trial court, you're going to be asking them to speculate on that point. But getting back to St. Jem and Coriel, they do have a conflict as to whether expert evidence is involved. But there is one single point that they are fully agreed upon. And that's where they both cite the Cobb case from California that says that we must use an objective standard. So St. Jem and Coriel are 100% aligned on that. My argument with Coriel is that they see a state that you must have an objective standard and then they walk away from that. And they said that the plaintiff's mere declaration I would have never gone through this surgery if I had known is enough. That's enough to get you to a jury. And that's why I said, as he put it, the sky is going to fall. But doesn't the jury determine what a reasonable person would think? So they hear the plaintiff's testimony and they can reject it if they don't agree that that's what a reasonable person would do. Isn't that the jury's function? I think that that's true. That's what Coriel points out. This is normally a question for the jury. The trial court looked at this and said no. The evidence is just far too strong. There is no evidence in this case other than his subjective statement that I would not have had this surgery fully advised. What type of evidence would it be? Give me an example of what else could have been induced. He could have said, gee, I'm really thinking about putting this off until next year, but the doctor convinced me to do it now. Something like that. But he did just the opposite. He said, forget my normal doctor, forget my doctor choice, I've got to get this now. Even his own experts said he was struggling, he was in pain, he needed this surgery now. Again, and this is something I have to reinforce repeatedly, I don't think we even get to this issue because he was informed of the complication. He walked into this surgery, or better yet, wheeled into this surgery with full knowledge that paralysis was a known complication of this surgery. You cannot separate the anesthesiology from the surgery. There's never any indication you could have one without the other. He knew about it. And that absolutely eliminates any chance of establishing the element of proximate cause. If there are no further questions from the court? I don't see any. Thank you. Thank you, Mr. O'Mara. Ms. Stewart? Good morning. My name is Sherry Stewart. I represent Christie Clinic. I know that the argument has been presented on both sides. I do have just a couple points I'd like to add. Mr. Wilson testified that he recalled a discussion about complication of anesthesia associated with the total hip replacement. And that discussion was either on July 22, 2004 with Dr. Schaffer or on August 11, 2004 with David Freeman, the physician's assistant when he signed the consent form. So he recalls being told that there might be something related to anesthesia that could cause paralysis. And that was either July 22 or August 11. That was his testimony. That was seven days before the surgery. What about the context in which this is? I'm required by the hospital to give you this warning and this information. And bad things can happen. But it's highly unlikely. But we inform you of these anyway. What does the ordinary patient, the reasonable person, do? They really take into account that there's this much chance that something bad might happen? Particularly after they've already had warnings when they signed into the hospital. They had warnings when they talked to the doctor. They had warnings when they talked to the physician's assistant. They're getting a warning on the morning of the surgery. However long before the surgery is going to occur depending upon everybody's schedule. They're being told again. They've already decided. Right. But the issue is whether the failure to inform of that risk caused the injury. So if he was informed of that risk... The failure to inform out here is different than the informing or failure to inform here. During a period of time waiting to get scheduled for surgery, somebody might say what you need instead of Gold's Gym is aquatic therapy. And you go to it every day for 14 days in a row. And you're getting some relief. And then maybe you start thinking about what the alternatives are. Maybe you start thinking well if I can walk upstairs that's pretty good. Maybe I need to wait until my pain level is at 7 or 8. And maybe it'll stay there until I die of a heart attack five years later. And I never have to have a hip replacement. All of this seems to be that which is fleshed out at trial. But at the same... I think though if you just go with trial. So all you would need under Coriell... No, I don't think that's all you would need. I think you need that information like I'm still doing okay. Yeah, I hate this pain because I'm an active person. But if I'm told I'm going to have a floppy leg and I'm not going to be able to go to Gold's Gym anymore even if that part of my pain is gone I'm going to really think about maybe it's better to wait until the pain gets more severe. He was informed. He says he knew of the risk of paralysis before the surgery. And he even says it's as of August 11. The other thing that we have in this case is the objective evidence of the plaintiff's own expert who says that most people... All of these same patients of this risk and most people say yes. When Dr. Schaefer was asked about... In Mr. Wilson's condition, he had severe arthritis. Dr. Smith said that most patients in Mr. Wilson's circumstances proceed with the surgery and he would have recommended surgery if Mr. Wilson had presented to him, the plaintiff's own expert. Dr. Schaefer when he was asked said that the majority of the patients say yes. So it's a matter of whether the risk a reasonable person would proceed with the surgery. So we have objective evidence which is St. Jem and Corey else cites to St. Jem that you need to have objective evidence. I mean it's right there in the Cobb case. So we have objective evidence throughout this record. We have evidence that he knew of the risk well before the surgery. He doesn't remember exactly who told him but he knew of the risk and it was before the surgery as of August 11th. We also have all of this objective evidence not only from plaintiff's own expert, Dr. Schaefer all of the evidence is that Mr. Wilson's condition was such that surgery was appropriate. Now he could have elected not to proceed with the surgery. That's not in dispute but it's what a reasonable person would do. And Dr. Smith, plaintiff's own expert says that Mr. Wilson was, he would have recommended surgery to him. I see my time's up if there's no questions. Thank you. Mr. Wilder. Mr. Wilder would you address before you get into your presentation counsel's closing statements there about what Dr. Smith said and how it actually benefits defendants cases so do your clients? Dr. Smith did say a reasonable person could have this and most people do. He has people who wait. It's an option. Dr. Schaefer said a lot of people had it. And the trial court said hundreds of people elect to have it. Now how, what their circumstances are compared to Mark. How many of them are 70 years old and walking with a walker? How many of them are 32 and played in the NFL last year? We don't know any of that. But the fact, if the test is do other people have the surgery the answer is always going to be yes. And if that's the totality of how you determine reasonable then Wilson's and every other plaintiff are in trouble because a lot of people have a lot of surgeries. Hardly anybody is the first person to have a surgery so there's always a track record that a lot of people have selected it and here we have undisputed. People have also rejected it based on where they're at and circumstances. The epidural, Dr. Smith said is very unlikely. He said there's about seven or eight things that could have happened. He wasn't asked specifically as to the epidural whether to a reasonable degree of medical certainty that wasn't the cause. Dr. Schaefer said that could have been dislocation, could have been retractions, and theoretically it could have been the anesthesia. So theoretically that could be the case. Paralysis. Counsel, Mr. Enrath said, well the list, you know, they talk about death. Think about it. If they talk about death when you get the anesthesia form then no matter what you died from in the hospital you accepted the risk of death. You know, if they cut your artery while they were trying to replace your knee and you bled to death, the anesthesia form said death. So there's no informed consent there. The form, in their brief, they said the form said paralysis. I read that thing twice. I had my legal assistant read it, I had a paralegal read it, and I urge you to read it. It doesn't say paralysis, it's just a generality. As far as Mark knowing, he was asked, it starts at page 87 of his deposition. It goes through about three pages. Do you recall anything at all discussed about complications of anesthesia associated with surgery? Yes, what was said. All I remember is that if they hit my spine or something, what had happened. They didn't say anything. I don't remember anything in particular, but then he's asked about when it was. He didn't recall. They just said something could happen. But you mentioned hitting something, yes. Do you recall what about hitting something? It wasn't hitting something, it was my spinal cord. What do you mean? They just said that something, whenever I was getting anesthesia, something might happen. I don't remember exactly what was said, but just remember something about anesthesia. Later he was asked, did you understand that when they hit your spine that could be paralysis, and he said yes. So the idea that anybody under his testimony set him down and said you could be paralyzed and miss anesthesia, that's not the case. As far as get it now, the idea you had to have it, Dr. Price was booked up for months, and he wanted to have the appointment, and he did get the appointment. But his testimony is when he went into the appointment, he didn't know if he was or wasn't going to have the surgery. That's why he wanted to talk to the doctor. So when he says I don't want to wait four months to see a doctor, I want to get an appointment with his partner who's available to see about this and talk about it, that doesn't mean he was determined he was going to get it right away. So I'd urge you, I mean, a lot of what we brought up today and a number of the panel have, it's trial stuff that we're talking about here, and summary judgment is a drastic remedy.  and with all respect to that, I don't see where much of that got drawn in this case, as opposed to determining what he said about how he was disabled to some extent was objective, but leaving out what he said about what he could still do and how active he was, still coaching girls softball, shooting baskets in the backyard with his daughters. You know, 53 years old, he could have decided to wait, and the defendant agrees people do decide to wait. So we'd urge you to vacate the summary judgment and send this back to trial. No questions? We'll take this matter under advisement and be in recess until the next case.